1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CARLO TOPALIAN,                                 1:09-cv-00034-AWI-DLB (HC)

              Petitioner,          FINDINGS AND RECOMMENDATION
                                                REGARDING PETITION FOR WRIT OF
    v.                                      HABEAS CORPUS

                                                [Doc. 1]
JAMES A. YATES,

              Respondent.
_____/

      Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

to 28 U.S.C. § 2254.  Petitioner is represented by Keith Allen Wattley, Esq.

<u>BACKGROUND</u>

      In 1992, Petitioner was convicted of conspiracy to commit aggravated mayhem.

Petitioner was sentenced to seven years to life in state prison.

      In the instant petition, Petitioner does not challenge the validity of his conviction; rather,

he contends the Board of Parole Hearings' (Board) August 16, 2007 decision finding him

unsuitable for release on parole violated his federal rights.

      Petitioner filed a state petition for writ of habeas corpus in the California Court of Appeal

challenging the Board's 2007 decision on the grounds that there was no evidence to support the

Board's finding, and the Board is applying its regulations in an unconstitutionally vague and

overbroad manner.  (Exhibit 1, to Answer.)  The Court of Appeal denied the petition finding

there was some evidence to support the findings of the Board.  (Exhibit 2, to Answer.)

1    Petitioner then filed a petition in the California Supreme Court, which was summarily

2    denied on May 21, 2008.  (Exhibits 3 & 4, to Answer.)

3    Petitioner filed the instant federal petition for writ of habeas corpus on December 19,

4    2008.  (Court Doc. 1.)  Respondent filed an answer to the petition on April 1, 2009.  (Court Doc.

5    15.)  Petitioner filed a traverse on May 1, 2009.  (Court Doc. 16.)

6                              STATEMENT OF FACTS[1]

7    Petitioner's father, Ara Topalian and Lyudmila Lalayan were married for sometime prior

8    to 1989.  Lalayan and her daughter, Shushan Eloyan, moved in with Ara Topalian and his two

9    children, Petitioner and his sister, Lulu.  The stepchildren did not get along.  Apparently,

10   Petitioner did not like Eloyan, and she moved out of the house.  Lalayan visited Eloyan

11   frequently and the Topalian family did not like it.  Petitioner and his sister placed their father in

12   the middle of their hostility and he was very upset.  Lalayan eventually separated from

13   Petitioner's father and lived with a friend.  During this time, Petitioner's father made threats

14   against Lalayan and Eloyan.  After the threats were made, Lalayan went to Eloyan's school and

15   saw Petitioner, along with another male and two females near the school.  Lalayan talked to

16   Petitioner and he said his father wanted to talk to her.  Emad Kalta, Petitioner's friend, went with

17   him to the school intending to have the girls beat up Eloyan.  Petitioner drove Kalta and the two

18   girls to the school.  Although the girls observed Eloyan at the school, they did not beat her up.

19   Kalta heard Petitioner's father state that he wanted to kill Eloyan and Lalayan because Eloyan

20   destroyed his marriage.  Petitioner was also present at that time.  Petitioner's father asked Kalta

21   about getting a silencer for a gun, and Kalta and Petitioner went to Kalta's cousin's house to get

22   it.  Petitioner's father offered $5,000 and a gold diamond ring to friends if they would kill Eloyan

23   and Lalayan.  He also asked people, while Kalta was present, if they would throw acid on Eloyan

24   or Lalayan.  However, Petitioner did not want to do these things.

25   Petitioner's friend, Jack Eghbalieh, heard Petitioner's father ask Petitioner about the

26   silencer.  Kalta told Jack that Petitioner asked him to place a fake telephone call to his father as if

27   _____

28   [1] This information is taken from the Board's 2007 hearing which quoted from the state appellate court
     decision.

                                        2

1   he had tried to get the silencer but was unsuccessful.  Kalta did so, and Petitioner told his father
2   that Kalta was not able to reach the person to get the silencer.

3          In the summer of 1989, Timothy Witt, went to Petitioner's house at his request.  Kalta
4   and a person named Mike were also there.  Witt heard Petitioner and his father have a
5   conversation in foreign language.  Petitioner told Witt, Kalta, and Mike that his father was
6   offering to pay them $5,000 to 10,000 to throw a jar of acid on Eloyan's face in retaliation for her
7   ruining his marriage.

8          On a different day, Petitioner's friend, Mohamad Jaafil, was visiting Petitioner at his
9   house, and he overheard Petitioner's father tell Petitioner Jaafil "will do it."  Jaafil got upset and
10  asked what they were talking about, and Petitioner explained that his father wanted to do
11  something to Eloyan.  Jaafil refused to become involved.  When Petitioner and Jaafil were
12  working together at a mini market, Petitioner complained about Eloyan stating she was "psycho"
13  and the cause of his father's divorce.

14         In February 1989, Lalayan and Eloyan moved to Glendale, and Petitioner's father and
15  Lalayan divorced in April of that year.  Lalayan obtained a restraining order in May of 1989 to
16  keep Petitioner's father away from her and her daughter.  On one occasion, Lalayan and
17  Petitioner's father agreed to meet at a store, but he did not arrive.  Lalayan later observed
18  Petitioner's father approaching her house.  She asked him why he was there, and Petitioner patted
19  his father's clothing as if he were looking for weapons.  On a prior occasion, Petitioner's father
20  called and asked Lalayan for something, and she send Eloyan to deliver it at a nearby store.

21         On or about July 16, 1989, Petitioner and Kalta obtained acid from an auto parts store.
22  They also went to Petitioner's school and obtained a bottle of yellowish liquid.  Kalta observed
23  Petitioner's father mix the acid and put it in a jar.  When some of the acid spilled onto the
24  concrete, it began to smoke.  Petitioner's father stated the acid would disfigure Lalayan or
25  Eloyan.  On this same day, Kalta, Petitioner, and Petitioner's father went to Glendale, and
26  Petitioner's father had the jar of acid.  Petitioner and his father told Kalta to throw the acid on
27  Lalayan or Eloyan.  Petitioner and his father discussed the plan of approaching the victim from
28  behind and throwing the acid.  Petitioner and his father pointed Eloyan's house out as they drove

3

and walked around the area.  The three of them went to a nearby store and called Lalayan and

Petitioner's father told her he had $1,000 and was waiting at the store.  Lalayan stated that she

would send Eloyan. Petitioner pointed Eloyan out to Kalta and handed him the acid.  Kalta

approached Eloyan alone and took the lid off the jar.  He then walked behind her, touched her on

the shoulder and asked the time.  When she turned around, Kalta threw the acid on her face.

Kalta dropped the jar, fled, and heard Eloyan scream.  As a result of the attack, Eloyan can see

light but is otherwise blind.  Expert testimony established the acid was nitric acid but it could not

be determined whether sulfuric acid was also used.  Kalta stated that Petitioner's father

threatened him and Petitioner if they did not participate.  When Kalta returned to the car after the

attack, Petitioner's father asked what happened, and Kalta said that Eloyan was screaming badly

and was hurt and both Petitioner and his father said "good."  Some of the acid splashed on

Kalta's face and he told Petitioner's father that he was going to tell the police what happened, but

Petitioner's father threatened him and tossed the acid.  The three agreed to say that Kalta helped

someone on the freeway with car trouble and the battery exploded splashing him in the face with

acid.  Petitioner and Kalta went to Kalta's house and told his family the cover story.  Kalta later

recanted and told his sister, Mirvet and Jaafil, that he, along with Petitioner and Petitioner's

father, were involved in throwing acid on Eloyan.  Kalta indicated that he carried out the attack

because Petitioner's father threatened him and Petitioner.

Petitioner's father later moved out of the state and told friends that he had a relative who

was in trouble in California for doing something very serious.   He stated that he and his nephew

were involved in throwing acid in the face of his stepdaughter.  He never mentioned that

Petitioner was involved.  When interviewed by police, Petitioner denied any involvement in the

incident.

(Exhibit 1, to Answer, Exhibit E, 2007 Hearing Transcript at 13-24 (hereinafter "Transcript").)

DISCUSSION

I.      Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

1   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries
2   v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th
3   Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,
4   521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).
5   The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its
6   provisions.

7       Petitioner is in custody of the California Department of Corrections and Rehabilitation
8   pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state
9   court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because
10  he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass
11  v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v.
12  Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a
13  habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the
14  petition is not challenging [her] underlying state court conviction.'").

15      The instant petition is reviewed under the provisions of the Antiterrorism and Effective
16  Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,
17  70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the
18  adjudication of the claim "resulted in a decision that was contrary to, or involved an
19  unreasonable application of, clearly established Federal law, as determined by the Supreme Court
20  of the United States" or "resulted in a decision that was based on an unreasonable determination
21  of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C.
22  § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

23      As a threshold matter, this Court must "first decide what constitutes 'clearly established
24  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
25  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this
26  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
27  of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other
28  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.   Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

In this instance, the last reasoned state court decision of the California Court of Appeal cited to In re Dannenberg, 34 Cal.4th 1061, 1070-1071 (2005) and In re Rosenkrantz, 29 Cal.4th

6

1    616 (2002), and found some-evidence supported the Board's decision finding Petitioner

2    unsuitable for release on parole.  Ylst v. Nunnemaker, 501 U.S. 797, 804-805 (1991); see also

3    Exhibit 4, to Answer.)

4    II.    Review of Petition

5           A parole release determination is not subject to all the due process protections of an

6    adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see

7    also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural

8    protections that particular situations demand). "[S]ince the setting of a minimum term is not part

9    of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not

10   constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at

11   1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole

12   board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive

13   advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an

14   "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the

15   inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the

16   Board must be supported by "some evidence" having an indicia of reliability. Superintendent,

17   Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th

18   Cir.1987).

19          "In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not

20   comport with 'the minimum requirements of procedural due process,' unless the findings of the

21   prison disciplinary board are supported by some evidence in the record.'  472 U.S. 445, 454

22   (1985), quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128.  In

23   determining whether the "some evidence" standard is met, the Court need not examine the entire

24   record, independently assess the credibility of witnesses, or re-weigh the evidence.  Id.  Rather,

25   the Court must determine whether there is any evidence in the record that could support the

26   conclusion of the disciplinary board.  Id., citing Superintendent v. Hill, at 455-56.  Although Hill

27   involved the accumulation of good time credits, the same standard applies to parole, as both

28   situations "directly affect the duration of the prison term." Id., citing Jancsek v. Oregon Bd. of

7

1    Parole, 833 F.2d at 1390.

2            In making a determination whether an inmate is suitable for parole, the Board is guided

3    by the following regulations:

4            (a) General. The panel shall first determine whether the life prisoner is suitable for
     release on parole. Regardless of the length of time served, a life prisoner shall be found
5    unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an
     unreasonable risk of danger to society if released from prison.

6

7            (b) Information Considered. All relevant, reliable information available to
     the panel shall be considered in determining suitability for parole. Such
8    information shall include the circumstances of the prisoner's social history; past
     and present mental state; past criminal history, including involvement in other
9    criminal misconduct which is reliably documented; the base and other
     commitment offenses, including behavior before, during and after the crime; past
10   and present attitude toward the crime; any conditions of treatment or control,
     including the use of special conditions under which the prisoner may safely be
11   released to the community; and any other information which bears on the
     prisoner's suitability for release. Circumstances which taken alone may not firmly
12   establish unsuitability for parole may contribute to a pattern which results in a
     finding of unsuitability.

13   15 Cal. Code Regs. §§ 2402(a) and (b).

14
             In this case, with regard to the procedural protections outlined in Greenholtz, Petitioner
15
     was provided all that is required.  Petitioner was given advance notice of the hearing, he was
16
     offered representation by counsel at the hearing, he was granted an opportunity to submit
17
     materials for the Board's consideration and an opportunity to be heard during the hearing, and he
18
     was provided a written decision explaining the reasons why parole was denied.  See Transcript.
19
             The California Supreme Court clarified the standard of the review applicable to parole
20
     decisions by the Board or Governor in In re Lawrence, 44 Cal.4th 1181 (2008).  The applicable
21
     standard "is whether some evidence supports the *decision* of the Board or the Governor that the
22
     inmate constitutes a current threat to public safety, and not merely whether some evidence
23
     confirms the existence of certain factual findings."  Id. at 1212 (emphasis in original and citations
24
     omitted).  As to the circumstances of the commitment offense, the Court concluded that
25
             although the Board and the Governor may rely upon the aggravated circumstances
26   of the commitment offense as a basis for a decision denying parole, the aggravated
     nature of the crime does not in and of itself provide some evidence of current
27   dangerousness to the public unless the record also establishes that something in
     the prisoner's pre- or post-incarceration history, or his or her current demeanor
28   and mental state, indicates that the implications regarding the prisoner's

                                                      8

dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.[2]

At the 2008 hearing, the Board found Petitioner unsuitable for release based on the circumstances of the commitment offense and Petitioner's lack of insight into the causative factors and lack of remorse. (Transcript at 83-92.)

The Board found the commitment offense was carried out in an especially cruel and callous manner and Petitioner lacked insight and remorse.  15 Cal. Code Regs. § 2402(c)(1)(D).[3] Despite the fact that the commitment offense occurred 18 years prior to the 2007 hearing, the Board continued to find it predicative of Petitioner's current dangerousness.  The evidence before the Board did not support such finding.  In this instance, Petitioner's father devised a plan to injure his former wife's daughter because of his belief that she had ruined his marriage. Petitioner became a part of the plot by soliciting others to carry out his father's plan.  He ultimately recruited his friend Kalta-who actually threw the acid at the victim's face.  The Board was troubled by the fact that despite Petitioner's statements of remorse, he did not admit to some of the facts set forth in the state appellate decision.  More specifically, Petitioner denied being present at the scene of the incident and denied participation in making the acid used in the

---

[2]  To this end, the Court recognized that its prior determination of "a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon current dangerousness, the manner in which courts apply the some evidence standard in evaluating the evidentiary value of the gravity of the commitment offense requires some clarification."  In re Shaputis, 44 Cal.4th 1241, 1254 (citing Lawrence, 44 Cal.4th at 1213-1214.)

[3]Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
(C) The victim was abused, defiled or mutilated during or after the offense.
(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

offense.  While the state appellate court decision is presumed correct-a prisoner is not required to admit to the factual circumstances of the underlying offense, particularly where there is affirmative evidence of sincere remorse and full responsibility for actions.  See e.g. Leon v. Kane, No. CIV S-04-2631, 2008 WL 2705156, at *15 (E.D. Cal. July 8, 2008); In re Caswell, 92 Cal.App.4th 1017, 1032-1033 (Cal.Ct.App. 2001); Cal. Penal Code § 5011(b) ("The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed.")  Although Petitioner may have disagreed with some of the factual contentions set forth in the appellate record, Petitioner acknowledged full responsibility for the injury caused to the victim.  Such finding is substantiated by several psychological evaluations dating back ten years which have found Petitioner's acceptance of responsibility and remorse to be sincere.  See Petition, Exhibit C at 1 (Petitioner "stated that he realizes the gravity of the offense and is extremely remorseful."); Exhibit H at 3 (Petitioner "recognizes the horrific nature of the crime and the suffering of the victim," and he continues to acknowledge the crime by accepting responsibility for his involvement and expressing sincere and genuine remorse); Exhibit M at 3 (discussing Petitioner's efforts to "verbalize [] remorse for his actions with expressions that appear[] sincere and genuine . . . [and to] experience[] sadness for the victim."); Exhibit N at 4 (Petitioner appeared to be "a sincere man who has matured while in prison . . . he accepts the consequences for his behavior and would even give his life to stop a crime in the future."); Exhibit O at 4 (Petitioner's "remorse is deep and sincere.").  Moreover, the 2003 psychological evaluation noted that Petitioner "has developed an understanding of his own personality dynamics at the time of the offense," and his "prognosis for a successful parole is excellent.").  Petition, Exhibit O at 4.

In the recent case of In re Shaputis, the California Supreme Court stated that the aggravated nature of the commitment offense and a lack of insight or understanding into the commitment offense may provide some evidence of current dangerousness. 44 Cal.4th 1241 (2008).  There, the Court found the Governor's finding of unsuitability was supported by a psychological report which opined that Petitioner's character had not changed and he had not gained insight into his antisocial behavior leading up and concerning to the commitment offense.

1    Shaputis, at 1252, 1260.  The Court noted "that expressions of insight and remorse will vary

2    from prisoner to prisoner and that there is no special formula for a prisoner to articulate in order

3    to communicate that he or she has gained insight into, and formed a commitment to ending, a

4    previous patter of violent behavior."  Id. at 1260 n.18.  Here, in contrast to Shaputis, the most

5    recent psychological evaluation, as well as previous evaluations, all indicate that Petitioner had

6    adequate insight into the crime and expressed sincere and heartfelt remorse.  Indeed, at the 2007

7    hearing, the Board quoted from the most recent psychological report dated March 28, 2006

8    stating:

9            The details of the offense and the inmate's improved insight into
             circumstances surrounding the crime are well documented in previous
10           evaluations. [Petitioner], as noted in earlier evaluations, acknowledges the crime
             as described in official versions of the offense and accepts responsibility for his
11           role in it.  In the present interview, he is able to recall the crime as described in
             prior evaluations.  His remorse for his actions appear sincere and genuine.  He
12           recognizes the horrific nature of the crime and the suffering of the victim.  He
             strongly regrets not coming to the aid of the victim and providing an alibi for his
13           father.  He continues to grabble with the relationship he had with his father,
             incorporating memories of violent behavior and physical and emotional abuse
14           with more positive ones.  He is able to describe how these experiences and
             misplaced loyalty affected his decision making at the time of controlling offense
15           and his efforts to obtain a mature understanding of it.  In assessment of
             dangerousness, within the controlled setting of prison, [Petitioner's] level of
16           dangerousness is estimated to be less than average compared to other inmates.  He
             has had no CDC 115 violations while incarcerated.  He has improved himself
17           educationally and vocationally.  He has sought out and participated in self-help
             and rehabilitative opportunities.  If released to the community, his level of
18           dangerousness is also estimated to be less than average as compared to other
             inmates.  He has no previous criminal history or history of substance abuse.  He
19           has not been a disciplinary problem while incarcerated.  He has demonstrated an
             ability to act independently and pro-socially despite the presence of anti-social and
20           disruptive inmate peers.  His network of social support and reasonable
             employability options are also positive indicators.

21

22   (Transcript at 40-42.)  Therefore, the evidence before the Board and state court did not provide

23   some evidence that Petitioner lack insight into the causative factors and remorse for the

24   commitment offense, and the finding appears to be based solely on his disagreement with some

25   of the factual circumstances surrounding the offense.  Under such circumstances, the Board's

26   finding that Petitioner lacked insight and remorse into his offense was completely unsupported.

27           In addition, during his entire 17 years incarceration, Petitioner has never received a single

28   disciplinary violation or counseling chrono, and by all means has been a role model inmate.

                                                    11

1  (Transcript at 39.)  Petitioner has participated in numerous vocational programs, including diesel

2  mechanics in 1998, precision instrumentation, electronics fundamentals, two certificates in

3  electronics technician, small business light industry education and job preparation, career

4  exploration, AC/DC metrology, precision pressure measurement, precision mass measurement,

5  precision flow measure, precision electrical measurement, precision dimensional measurement,

6  introduction to measurement and calibration, and precision instrument technician.  (Transcript at

7  30-32.)  Petitioner also received several certificates for completion of self-help programs,

8  including book reports through the lifer support group per CDC 128B's dated September 12,

9  2006, October 3, 2006, November 9, 2006, December 5, 2006, January 8, 2007, and February 5,

10  2007; active participation in Alcoholics Anonymous (AA) for five years; charity fund-raiser

11  through AA; and active participation in Narcotics Anonymous (NA) for six years. (Id. at 34-35.)

12  Petitioner also participated in psychological therapy, IMPACT program, 60 sessions of

13  behavioral therapy group, Success from the Inside Out series, anger and stress management,

14  communication, handling suppression course, What is Anger Program, Parenting from the Inside

15  Out, Success Ahead, Know Thy Self and Ticket to the Future, and Victims' Awareness Course.

16  (Id. at 37-38.)  The Board acknowledged that Petitioner had viable parole plans, which included,

17  among others, a solid offer of residency with his sister and offer of employment at her real estate

18  company.  (Id. at 45-46, 88.)

19       Despite Petitioner's substantial rehabilitation, he has been incarcerated over 8 years

20  beyond his minimum eligible release date.  Petitioner became eligible for parole in 1997 and has

21  been denied parole at seven hearings almost all based on the circumstances of the commitment

22  offense.  (See Petition, Exhibits  B, F, P, Q, R, S, T.)  Thus, this case presents a situation where

23  the Board has continuously denied parole based on immutable circumstances in violation of

24  Petitioner's due process rights.  In Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003), the

25  Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the

26  circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative

27  goals espoused by the prison system and could result in a due process violation." Although a

28  denial of parole initially can be justified by relying on the gravity of the offense, over time,

"should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Irons v. Carey, 505 F.3d 846, 853  (9th Cir. 2007), *citing* Biggs, 334 F.3d at 916. Nevertheless, in both Irons and Biggs, the Ninth Circuit upheld the denials of parole based solely on the commitment offense. This was because in each of these cases the prisoner had not yet served the minimum term of his sentence.

In sum, other than the unchanging facts of Petitioner's crime, all applicable criteria indicate he is suitable for parole release. In light of Petitioner's exemplary prison behavior, evidence of rehabilitation and proven self-control, *inter alia,* the circumstances of Petitioner's offense no longer have a predictive value. The circumstances of the offense do not amount to some evidence to support the Board's conclusion that Petitioner poses an unreasonable risk of danger to the public if released. Therefore, the Board's denial of parole has resulted in a due process violation, and the state courts' determination was an unreasonable application of the "some evidence" standard. 28 U.S.C. § 2254(d)(1).  The petition should be granted, and the Board should be ordered to set a parole release date.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be GRANTED;

2.      The Board of Parole Hearings be DIRECTED to reverse its August 16, 2007 , decision, thereby providing Petitioner with any parole credit for time since the August 16, 2007 decision as if release had been granted and any other term credit which he is entitled to by law.[4]

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

---

[4] The Court notes that on May 14, 2009, Petitioner was released on parole for a determinate term of 5 years. (Notice of Release, Exhibit 1.)

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

   IT IS SO ORDERED.

   **Dated:**   **April 8, 2010**          _____ **/s/ Dennis L. Beck**          
                                              UNITED STATES MAGISTRATE JUDGE